No. 22-55480

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

HOWARD ITEN

*Plaintiff/Appellant*

v.

COUNTY OF LOS ANGELES

*Defendant/Appellee.*

On appeal from the United States District Court
for the Central District of California, No. 2:21-cv-00486-DDP-JEM
Honorable Dean D. Pregerson, District Judge

## APPELLEE'S BRIEF

**GLASER WEIL FINK HOWARD AVCHEN & SHAPIRO, LLP**
Andrew Baum
Jesse B. Levin
10250 Constellation Boulevard, 19th Fl
Los Angeles, California 90067
(310) 282-6298

**LOS ANGELES COUNTY COUNSEL**
Dawyn R. Harrison,
Interim County Counsel
Sayuj Panicker, Deputy County Counsel
648 Hall of Administration
500 West Temple Street, 12th Fl
Los Angeles, California 90036-3626
(213) 974-1811

**GREINES, MARTIN, STEIN & RICHLAND LLP**
Edward L. Xanders
5900 Wilshire Boulevard, 12th Floor
Los Angeles, California 90036
(310) 859-7811 / Fax: (310) 276-5261

*Attorneys for Defendant/Appellee County of Los Angeles*

## TABLE OF CONTENTS

**PAGE**

JURISDICTIONAL STATEMENT    1

STATEMENT OF ISSUES    1

STATEMENT OF THE CASE    3

     A.    In March 2020, responding to the COVID-19 pandemic, the County adopted a resolution restricting residential and commercial evictions, which it gradually extended through January 31, 2022.    3

         1.    The state and local emergency declarations.    3

         2.    The County's initial eviction provisions.    4

         3.    Renewals and modifications.    6

         4.    The Resolution's public-policy predicate.    8

     B.    In March 2020, Iten's tenant already had a history of lease violations and was a sub-lessee under a five-year lease ending in August 2020.    9

     C.    In August 2020, at the lease agreement's expiration, Iten opted to enter into a new five-year lease with the tenant, instead of ending the relationship.    10

     D.    Iten's tenant never complied with the Resolution's requirement to certify a COVID-19-related inability to pay rent at the start of each month.    11

     E.    In January 2021, only five months after executing the new lease, Iten sued the County for damages and declaratory relief, claiming the Resolution violated the U.S. Constitution's Contracts Clause.    12

     F.    The district court dismissed Iten's complaint with leave to amend, based on the Tenant's violation of the Resolution's notice requirements and no alleged "extenuating circumstance."    13

i

# TABLE OF CONTENTS

**PAGE**

G. Iten filed an amended complaint adding an "extenuating circumstance" allegation. ............................................................ 14

H. In April 2022, the district court rejected Iten's "extenuating circumstance" allegation as legally deficient and dismissed the amended complaint with prejudice. .................................... 15

I. The Resolution expired on January 31, 2022 as to commercial evictions; Iten has sued for unlawful detainer. ...................... 16

SUMMARY OF ARGUMENT ..................................................................... 17

STANDARD OF REVIEW ........................................................................... 20

ARGUMENT ................................................................................................. 21

I. The District Court Correctly Dismissed Iten's Amended Complaint For Lack Of Standing. ............................................................................. 21

   A. Iten must allege facts sufficient to confer standing. ............. 21

   B. Iten lacks standing because he failed to allege a sufficient "extenuating circumstance" for the Tenant's violation of the seven-day notice requirement. .................................................. 23

      1. An extenuating circumstance for not complying with the seven-day notice requirement is an *inability* to timely comply, not a purported "mistake of law" for *never* complying. ........................................................................ 23

      2. Caselaw defeats Iten's construction. ............................ 28

      3. The notice requirement protects landlords. ................. 31

      4. The County never agreed with Iten's construction. .... 32

   C. Iten lacks standing because he could have ended his relationship with the Tenant at the end of August 2020, instead of executing the contract on which his claim rests. ......................................... 34

ii

# TABLE OF CONTENTS

**PAGE**

II.    Iten Failed To State A Viable Contracts Clause Claim.    37

    A.    The governing review standards entitle the County to deference.    37

        1.    This Circuit's recent, binding COVID-19 eviction-moratorium Contracts Clause case confirms that the review standard is deferential to the County.    37

        2.    *Jacobson* deference remains relevant.    41

    B.    The County's now-expired commercial-eviction provisions did not violate the Contracts Clause.    45

        1.    The Resolution did not substantially impair Iten's lease.    46

        2.    Even assuming the Resolution substantially impaired the lease, Iten's claim still fails because the Resolution was an appropriate and reasonable way to redress the turmoil caused by the COVID-19 pandemic.    51

III.    The District Court Properly Granted Dismissal With Prejudice.    55

CONCLUSION    57

STATEMENT OF RELATED CASES    59

PROOF OF SERVICE    60

# TABLE OF AUTHORITIES

**PAGE(S)**

<u>**Cases**</u>

*2 Tudor City Place Assocs. v. 2 Tudor City Tenants Corp.*,
   924 F.2d 1247 (2d Cir. 1991) ............... 48

*Altman v. Cnty. of Santa Clara*, 20-CV-02180,
   2020 WL 2850291 (N.D. Cal., June 2, 2020) ............... 42

*1119 Delaware v. Cont'l Land Title Co.*,
   20 Cal. Rptr. 2d 438 (Ct. App. 1993) ............... 26

*Allied Structural Steel Co. v. Spannaus*,
   438 U.S. 234 (1978) ............... 37

*Apartment Assoc. of Los Angeles Cnty., Inc. v. City of Los Angeles,*
   10 F.4th 905 (9th Cir. 2021) ............... 37, 38, 39, 40, 41, 46, 49, 51, 52, 53, 54, 55

*Apartment Owners Advisory Council v. Marks*,
   No. 21 CV 10175, 2022 WL 4357951 (S.D. N.Y. Sept. 20, 2022) ............... 22, 35

*Ashcroft v. Igbal*,
   556 U.S. 662 (2009) ............... 20

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
   459 U.S. 519 (1983) ............... 20

*Atkins v. Parker*,
   472 U.S. 115 (1985) ............... 26

*Auracle Homes*,
   478 F. Supp. 3d ............... 52

*Auracle Homes, LLC v. Lamont,*
   478 F. Supp. 3d 199 (D. Conn. 2020) ............... 49

*Baptiste v. Kennedy*,
   490 F. Supp. 3d 353 (D. Mass. 2020) ............... 50, 52

iv

# TABLE OF AUTHORITIES

**PAGE(S)**

*Best Supplement Guide, LLC v. Newsom*,
  No. 20-CV-00965, 2020 WL 2615022 (E.D. Cal. May 22, 2020)    42

*Boschetto v. Hansing*,
  539 F.3d 1011 (9th Cir. 2008)    56, 57

*Calm Ventures LLC v. Newsom,*
  548 F. Supp. 3d 966 (C.D. Cal. Jul. 13, 2021)    42

*Calvary Chapel Dayton Valley v. Sisolak*,
  140 S. Ct. 2603 (2020)    45

*City of West Hollywood v. Beverly Towers, Inc.*,
  805 P.2d 329 (Cal. 1991)    26

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)    21, 35, 36

*Cmty. Youth Athletic Ctr. v. City of Nat'l City*,
  164 Cal. Rptr. 3d 644 (Ct. App. 2013)    30

*Cnty. of Los Angeles Dep't of Pub. Health v. Superior Ct. of Los Angeles Cnty.*,
  275 Cal. Rptr. 3d 752 (Ct. App. 2021)    42, 44, 45, 55

*Craik v. Cty. of Santa Cruz,*
  96 Cal. Rptr. 2d 538 (Ct. App. 2000)    33, 34

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006)    21

*Daniels-Hall v. Nat'l Educ. Ass'n*,
  629 F.3d 992 (9th Cir. 2010)    3, 6, 20, 34, 37

*El Papel LLC* v. Durkan,
  No. 20-CV-01323, 2021 WL 4272323 (W.D. Wash. Sep. 15, 2021), r*eport and recommendation adopted as modified,* No. 20-CV-01323, 2022 WL 2828685 (W.D. Wash. July 20, 2022)    52

# TABLE OF AUTHORITIES

**PAGE(S)**

*Elmsford Apartment Assoc., LLC v. Cuomo*,
469 F. Supp. 3d 148 (S.D. N.Y. 2020)                                    49, 52

*Energy Reserves Group v. Kansas Power and Light Co.*,
459 U.S. 400 (1983)                                              39, 40, 50, 54

*Farhoud v. Brown*,
No. 20-CV-2226, 2022 WL 326092 (D. Or. Feb. 3, 2022)                    50, 52

*Farmers' and Merch. Bank of Monroe, N.C. v. Fed. Rsrv. Bank of Richmond*,
262 U.S. 649 (1923)                                                       48

*Gallo v. District of Columbia*,
No. 21-CV-03298, 2022 WL 2208934 (D. D.C. Jun. 21, 2022)               49, 52

*Gish v. Newsom*,
No. EDCV 20-755, 2020 WL 1979970 (C.D. Cal. Apr. 23, 2020)                42

*Gonzalez v. Inslee*,
504 P.3d 890 (Wash. App. 2022)                                     48, 49, 50

*Hanooka v. Pivko*,
28 Cal. Rptr. 2d 70 (Ct. App. 1994)                                       30

*HAPCO v. City of Philadelphia*,
482 F.Supp.3d 337 (E.D. Pa. 2020)                                  49, 50, 52

*Harmon v. Markus*,
412 F. App'x 420 (2d Cir. 2011)                                           47

*Heights Apartment, LLC v. Waltz*,
30 F.4th 720 (8th Cir. 2022)                                   47, 50, 52, 53

*Heights Apartments, LLC v. Walz*,
39 F.4th 479 (8th Cir. 2022)                                              52

*Home Building & Loan Ass'n v. Blaisdell*,
290 U.S. 398 (1934)                                                   38, 53

## TABLE OF AUTHORITIES

**PAGE(S)**

*Hopkins & Carley v. Gens*,
   135 Cal. Rptr. 3d 1 (Ct. App. 2011)     30

*Housing Improvement Program v. City of New York,*
   492 F. Supp. 3d 33 (E.D. N.Y. Sep. 30, 2020)     47

*In re Estate of Dye*,
   112 Cal. Rptr. 2d 362 (Ct. App. 2001)     26

*In re Findley,*
   593 F.3d 1048 (9th Cir. 2010)     38

*Jacobson v. Commonwealth of Massachusetts*,
   197 U.S. 11 (1905)     41, 42, 43

*Jevons v. Inslee*,
   561 F. Supp. 3d 1082 (E.D. Wash. 2021)     49, 50, 52

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
   480 U.S. 470 (1997)     38, 39, 41, 54, 55

*Kruser v. Bank of Am.*,
   281 Cal. Rptr. 463 (Ct. App. 1991)     25

*Lazar v. Kroncke*,
   862 F.3d 1186 (9th Cir. 2017)     39

*LNS Enterprises LLC v. Cont'l Motors, Inc.*,
   22 F.4th 852 (9th Cir. 2022)     57

*Marshall v. United States*,
   414 U.S. 417 (1974)     43

*Matsuda v. Cty. & Cnty. of Honolulu*,
   512 F.3d 1148 (9th Cir. 2008)     39

*McCormick v. Bd of Supervisors*,
   243 Cal. Rptr. 617 (Ct. App. 1988)     29, 30

# TABLE OF AUTHORITIES

**PAGE(S)**

*Melendez v. City of New York*,
  16 F.4th 992 (2d Cir. 2021) .................................................. 50

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ............................................................ 21

*Norfolk and W. Ry. Co. v. Am. Train Dispatchers Ass'n*,
  499 U.S. 117 (1991) ............................................................ 47

*Nwosu v. Uba,*
  19 Cal. Rptr. 3d 416 (Ct. App. 2004) ................................. 31

*Pro. Beauty Fed'n of California v. Newsom,*
  No. 20-CV-04275, 2020 WL 3056126 (C.D. Cal. June 8, 2020) ...... 42

*Raines v. Byrd*,
  521 U.S. 811 (1997) ............................................................ 21

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020) ...................................................... 44, 45

*S. Bay United Pentecostal Church v. Newsom,*
  140 S. Ct. 1613 (2020) .............................................. 43, 44, 55

*S. California Rental Housing Ass'n v. Cnty. of San Diego*,
  550 F. Supp. 3d 853 (S.D. Cal. 2021) ................................ 47

*Schmier v. U.S. Ct. of Appeals for Ninth Cir.*,
  279 F.3d 817 (9th Cir. 2002) ..................................... 20, 21, 22

*Sonner v. Premier Nutrition Corp.*,
  971 F.3d 834 (9th Cir. 2020) ............................................. 20

*State Farm Fire & Cas. Co. v. Pietak*,
  109 Cal. Rptr. 2d 256 (Ct. App. 2001) ............................ 29, 30

*Sveen v. Melin*,
  138 S. Ct. 1815 (2018) ........................... 39, 40, 46, 48, 51

# TABLE OF AUTHORITIES

**PAGE(S)**

*U.S. ex rel. Chunie v. Ringrose,*
  788 F.2d 638 (9th Cir. 1986)                                    20

*Whitmore v. Arkansas,*
  495 U.S. 149 (1990)                                             22

*Wilson v. Lynch*,
  835 F.3d 1083 (9th Cir. 2016)                                   34

## **Statutes**

15 U.S.C.A. § 636m                                               32

28 U.S.C. § 1291                                                  1

Cal. Code Civ. Proc. §473                                        17

U.S. Const. Art. I                                               37

U.S. Const. Art. III                                             13

## **Other Authorities**

*Toward a Revitalization of the Contract Clause*,
  51 U. Chi. L. Rev. 703 (1984)                                  38

**JURISDICTIONAL STATEMENT**

Plaintiff Howard Iten (Iten), a commercial landlord, claims that the County of Los Angeles (the County) violated the Contracts Clause of the U.S. Constitution by subjecting him to a County resolution restricting commercial evictions in response to the COVID-19 pandemic. He appeals from a district court order dismissing his complaint with prejudice. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

**STATEMENT OF ISSUES**

1. Did the district court properly dismiss Iten's complaint for lack of standing, where (a) Iten admitted that his tenant never complied with the County resolution's notice prerequisite for claiming eviction protection and the complaint's alleged "extenuating circumstance" for non-compliance was a purported "mistake of law" that as a matter of law does not suffice; and (b) the complaint alleges that Iten could have ended his relationship with the Tenant but instead entered into the contract on which his claim rests while the County resolution *was already in effect*, based on speculation about future events?

2. Does Iten's complaint fail to state a claim for violation of the Contracts Clause where (a) as a matter of law Iten cannot meet the threshold Contracts' Clause test of showing that the County resolution substantially impaired his contract with the tenant, because Iten entered that contract while the resolution

1

already was in effect; and (b) applying the deference that Ninth Circuit law requires, as matter of law Iten also cannot meet the second part of the Contracts Clause test—showing that the County resolution was *not* drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose?

3.     Did the district court correctly grant dismissal with prejudice, instead of affording Iten jurisdictional discovery or another attempt to amend, when Iten never asked the district court for jurisdictional discovery or another amendment, any amendment would be futile, and Iten offers only a legally-deficient hunch or belief that jurisdictional discovery might yield something relevant?

## STATEMENT OF THE CASE

Because this appeal arises from the grant of a motion to dismiss, we rely on the allegations in the operative complaint, plus the exhibits thereto and judicially-noticeable government orders. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-98 (9th Cir. 2010).

**A.     In March 2020, responding to the COVID-19 pandemic, the County adopted a resolution restricting residential and commercial evictions, which it gradually extended through January 31, 2022.**

### 1.     The state and local emergency declarations.

In early March 2020, Governor Newsom proclaimed a state of emergency because of COVID-19 and issued an executive order authorizing local governments to halt residential and commercial evictions based on the nonpayment of rent resulting from decreased income due to COVID-19.  (1-RJN-6-9.)[1]  He recognized that "the economic impacts of COVID-19 have been significant . . ., and could threaten to undermine . . . the stability of California businesses," and that "business closures . . . or layoffs related to COVID-19" are causing "substantial losses of income" that "hinder[] the[] ability [of Californians] to keep up with their

---

[1] The RJN cites are to the concurrently-filed exhibits in support of Appellee's Request for Judicial Notice.  The ER cites are to the appellant's Excerpts of Record.  The AOB cites are to the Appellant's Opening Brief.

3

rents, mortgages and utility bills . . . ." (1-RJN-6.) The emergency order authorized local jurisdictions to determine "that promoting stability amongst commercial tenancies is also conducive to public health, such as by allowing commercial establishments to decide whether and how to remain open based on public health concerns rather than economic pressures, or to mitigate the economic impacts of COVID-19 . . . ." (1-RJN-6.)

That same day, the County's Board of Supervisors (the Board) and the Los Angeles County Health Department declared local COVID-19 emergencies. (1-RJN-14.)

### 2. The County's initial eviction provisions.

In response to the emergency declarations and the governor's executive order, on March 19, 2020, the Board chair adopted an executive order imposing a "temporary moratorium" on residential and commercial evictions of tenants who could not pay rent because of COVID-19. (1-RJN-14-18.) The Board ratified the executive order and later adopted its own resolution. (1-RJN-11-13, 48-57.) The executive order and initial resolutions referred to an "eviction moratorium" but the Board later changed the title to the "Tenant Protections Resolution." (1-RJN-15, 48, 198-225.) It made the title change "[t]o avoid confusion," because the County resolution only "provides tenants with affirmative defenses against evictions; it does not prohibit property owners from filing evictions in accordance with State law." (1-RJN-209; *accord*, 1-RJN-201.) We therefore refer to the County's

4

eviction provisions (initially as a ratified executive order and then as a periodically-renewed resolution) collectively as the "Resolution."

The initial Resolution provisions provided, in pertinent part:

- Residential or commercial landlords cannot evict a residential or commercial tenant for nonpayment of rent, late charges, or any other fees accrued "if the Tenant demonstrates an inability to pay rent and/or related charges due to financial impacts related to COVID-19, the state of emergency regarding COVID-19, or following government-recommended COVID-19 precautions, *and the Tenant has provided notice to the Landlord within seven (7) days after the date the rent was due, unless extenuating circumstances exist*, that the Tenant is unable to pay. . . ." (1-RJN-15, italics added.)

- A financial impact "means a substantial loss of household income due to business closure, loss of compensable hours of work or wages, layoffs, or extraordinary out-of-pocket medical expenses." (1-RJN-15-16.)

- A financial impact is "related to COVID-19" if it results from (a) the Tenant is "diagnosed with COVID-19, or caring for a household or family member diagnosed with COVID-19"; (b) "a lay-off, loss of hours, or other income reduction resulting from business closure or other economic or employer impacts of COVID-19"; (c) compliance with a County recommendation "to stay home, self-quarantine, or avoid congregating with others during the state of emergency"; (d) "extraordinary out-of-pocket medical expenses related to diagnosis and testing

for and/or treatment of COVID-19"; or (e) "child care needs arising from school closures relayed to COVID-19." (1-RJN-16.)

• A Tenant shall have six months following the order's termination to pay any past-due amounts, although tenants and landlords are encouraged to agree to a payment plan. (1-RJN-16.)

• Rather than barring unlawful detainer actions or prohibiting evictions for fault, the order provides the tenant an affirmative defense if an unlawful detainer is filed based on a COVID-19 related failure to pay rent or no-fault reasons. (1-RJN-18.)

### 3. Renewals and modifications.

The Resolution's initial expiration date was May 31, 2020. (1-RJN-15). The Board reviewed and extended the Resolution for renewal every 30 days at first, and then for longer periods as the governor extended his emergency order. (*See* 1-RJN-29-30; 2-RJN-262-266.) Pursuant to those reviews, the Board extended the Resolution as to commercial tenants from May 31, 2020 to June 30, 2020, then to July 31, 2020, then to October 31, 2020, then to February 28, 2021, then to June 30, 2021, then to September 30, 2021, and finally to January 31, 2022. (*Id.*) The Resolution continues through 2022 as to certain low-income residential tenants, but the commercial-eviction restrictions ended January 31, 2022. (2-RJN-270-271.)

The County added provisions prohibiting landlords from harassing or retaliating against tenants exercising their rights under the Resolution, but it also protected landlords by specifying that actions to terminate tenancies only constitute harassment if premised "upon facts which the Landlord has no reasonable cause to believe to be true or upon a legal theory which is untenable under the facts known to the Landlord."  (*See, e.g.,* 1-RJN-118, 160, 190.)  Landlords cannot be liable for harassment for bringing an action to recover possession unless the Tenant obtains a favorable termination of that action. (*See, e.g.,* 1-RJN-118, 160, 190.)

As to commercial tenants, the Resolution's provisions have largely remained the same.  However, because of the pandemic's far greater detrimental impact on small companies, the County added provisions that commercial tenants with less than ten employees:  (a) "may provide, and landlords must accept, a self-certification inability to pay rent" that is given within the required seven-day notice time-frame, while larger tenants "must provide written documentation demonstrating financial hardship, along with notice of inability to pay rent"; and (b) can take up to a year after the Resolution expires to repay unpaid rent, while larger tenants must repay within six months. (*See, e.g.,* 1-RJN-21, 53, 71-72, 115-116, 158-159, 187-188.)  The County also added that, as of June 2021, landlords must notify companies with less than ten employees of their rights under the Resolution and cannot immediately enforce personal guarantees for rent those tenants incur during the period covered by the Resolution. (*See* 1-RJN-178, 183; 2-RJN-265.)

7

### 4.    The Resolution's public-policy predicate.

The County enacted the Resolution's commercial-eviction provisions for multiple reasons, including:

- The "sudden and unexpected income loss" from COVID-19 leaves commercial tenants "unable to pay rent and vulnerable to eviction" and hinders businesses "from fulfilling their financial obligations, including paying rent and making public utility payments such as water and sewer charges." (1-RJN-14, 37, 47-48, 50.)  COVID -19 causes, and will continue to cause, "serious financial impacts" to businesses, including "the substantial loss of income due to illness, business closures, loss of employment, or reduced hours, thus impeding their ability to pay rent[.]" (1-RJN-49; *see* 1-RJN-199.)

- The pandemic increases the need to ensure access to running water and power. (1-RJN-15, 48, 50.)

- The displacement of residential and commercial tenants unable to pay rent, and resulting loss of employment, impedes compliance with the County's Stay at Home orders and promotes housing instability that may push individuals into homelessness. (1-RJN-14, 49, 199.)

- The County's orders temporarily shutting down certain business for the public health, safety and welfare prevents businesses from using their property as intended and impedes paying rent. (1-RJN-49.)

- "[C]ommercial eviction protections should prioritize small businesses that are more likely to experience severe financial hardship due to Covid-19 and who collectively make up the backbone of the local economy." (1-RJN-21.)

**B.    In March 2020, Iten's tenant already had a history of lease violations and was a sub-lessee under a five-year lease ending in August 2020.**

Iten is a retired mechanic who owns a commercial rental property used as an auto repair shop, located in the City of Lawndale and within the County. (ER-65, 69.) As of March 2020, Iten's tenant (the Tenant) was a sub-lessee of a five-year commercial lease agreement set to expire in a few months, at the end of August 2020. (ER-69.) The Tenant has always had less than ten employees; it is a franchisee of a nationally recognized auto repair company. (ER-69.) Prior to March 2020, the Tenant had a history of lease violations, including unauthorized, illegal property "improvements" and failure to timely pay rent, but Iten never pursued eviction. (ER-64-65, 70.)

In April 2020, the Tenant told Iten (through Iten's property management company) that it "is very adversely [a]ffected by Covid 19 and . . . will not be able to pay the rent." (ER-70, alterations in original.) The Tenant paid nothing over the next several months. (ER-70.) The Tenant "remained fully open for business" throughout the pandemic as an essential business. (ER-76.) Also, during the

pandemic, "federal legislation has made funds available for small businesses like [the] Tenant . . . ." (ER-76.)

**C. In August 2020, at the lease agreement's expiration, Iten opted to enter into a new five-year lease with the tenant, instead of ending the relationship.**

When the 2015 lease expired at the end of August 2020, Iten opted not to end his relationship with the Tenant despite the history of lease violations. (ER-70.) Instead, Iten chose to enter into a new five-year lease directly with the Tenant (formerly a sub-lessee), commencing September 1, 2020. (ER-70.)

The new lease requires base rent and operating expenses to be paid monthly, on or before the first day of each month, and imposes one-time late charges and interest charges for missed payments. (ER-70.) The new lease also requires the Tenant to pay all of the past-due rent owed under the prior lease/sub-lease agreements (approximately $38,700) in separate monthly amounts (approximately $3,200) until the past-due rent is paid. (ER-70.) The new lease authorizes Iten "to terminate the Tenant's right to possession by any lawful means for, among other reasons, failure of the Tenant to satisfy in a timely fashion the monetary obligations imposed by the lease." (ER-71.)

Iten claims that, given the prior "history of lease breaches," he would "have preferred to end his business relationship with the Tenant when the 2015 lease expired at the end of August 2020" and commenced an unlawful detainer action if

necessary but he instead "concluded that he had no prudent course of action open to him other than to negotiate a new lease with the Tenant so as to increase the chances of someday recovering the past-due rent." (ER-70.) Iten purportedly based this conclusion on "his understanding of the then-applicable state and local eviction moratoriums." (ER-70.)

After entering into the new lease, the Tenant "failed to make any subsequent payments in a timely fashion." (ER-71.)

**D.      Iten's tenant never complied with the Resolution's requirement to certify a COVID-19-related inability to pay rent at the start of each month.**

The Resolution required the Tenant to provide certification of an inability to pay because of COVID-19 related reasons within seven days of *each date* rent was due. (*See, e.g.*, 1-RJN-15, 38, 51, 70, 113, 156, 182, 212-213, 238.) Iten concedes that the Tenant *never* complied with this notice requirement: "The Tenant has not provided timely monthly notice of the inability to meet the lease's payment terms because of a qualifying COVID-related reason, as generally required under the County's eviction moratorium." (ER-71.)

In October 2020, Iten's property management firm told Iten "that the Tenant had stated that 'times are tough and [the Tenant] will not be able to pay the full amount on time" but Iten alleges no other communications. (ER-71, original alterations.) The Tenant "never provided documentation to substantiate a COVID-

11

related inability to meet either the prior sublease's or the current lease's terms."
(ER-71.)

    **E.**    **In January 2021, only five months after executing the new lease, Iten sued the County for damages and declaratory relief, claiming the Resolution violated the U.S. Constitution's Contracts Clause.**

In January 2021, only five months after entering into the new five-year lease with the Tenant, Iten sued the County for damages and declaratory relief. (ER-109-115.)  He alleged only one violation:  that applying the Resolution to his commercial lease with the Tenant violated the Contracts Clause of the U.S Constitution.  (ER-110, 118.)  He only sought declaratory relief, damages and attorney's fees, not injunctive relief.  (ER-122.)

Iten alleged that the Resolution substantially impaired his contract with the Tenant in four ways:

- It barred Iten "from evicting tenants who fail, for specified reasons, to pay rent during the moratorium period," thereby eliminating his key remedy "to speedily remedy a tenant's breach."  (ER-73, 114, 118-19.)

- It barred Iten "from requiring the payment of rent during the moratorium period," substantially impinging on his "contractual right to a monthly stream of income."  (ER-114, 119.)

- It barred Iten "from assessing late fees or interest" on unpaid rent, eliminating an inducement to contract adherence.  (ER-114, 119.)

12

- It gave the Tenant twelve months after the Resolution expired as to commercial evictions to pay any rent protected by the Resolution. (ER-114, 119.)

**F.      The district court dismissed Iten's complaint with leave to amend, based on the Tenant's violation of the Resolution's notice requirements and no alleged "extenuating circumstance."**

The County moved to dismiss Iten's complaint. (Dkt-16.) The district court granted the motion. (ER-79-86.) It correctly recognized that standing under Article III of the Constitution requires an "injury in fact" to plaintiff caused by the alleged wrongful conduct, and that if the Resolution "does not prevent [Iten] from evicting his tenant, then as a matter of course, the [Resolution] cannot have caused [Iten] any injury." (ER-83.)

The district court recognized that there is "no dispute that the [T]enant's notice of his inability to pay rent was not timely" but the Tenant could still claim the eviction protections if its untimely notice resulted from "extenuating circumstances." (ER-85.) But, the court recognized, the complaint did not plead any extenuating circumstances and "'it is inappropriate to assume that the plaintiff can prove facts which it had not alleged . . . .'" (ER-85, original ellipses and citation omitted.) "The fact that the tenant failed to pay rent because 'times are tough' cannot support an inference that some extenuating circumstance prevented the tenant from providing the landlord with the timely notice the [Resolution]

13

requires." (ER-86.) The court ruled that the complaint must be dismissed for lack of standing "[b]ecause, under the facts alleged, [Iten's] tenant does not appear to qualify for the [Resolution's] protections," which means Iten "has not adequately alleged that the [Resolution] caused him any injury." (ER-86.)

The court gave leave to file an amended complaint. (ER-86.)

## G.     Iten filed an amended complaint adding an "extenuating circumstance" allegation.

Two weeks later, Iten filed an amended complaint that again solely sought damages and declaratory relief on the ground that the Resolution violates the Contracts Clause when applied to his lease with the Tenant. (ER-63-78.) The amended complaint tracks the prior complaint with only one exception: After conceding that the Tenant never complied with the Resolution's notice requirements, the amended complaint alleges:

> "Following this Court's September 15, 2021, [dismissal] order, Mr. Iten's property management company contacted the Tenant to inquire as to the reason for the Tenant's failure to provide monthly notices and whether extenuating circumstances exist to excuse that failure. The Tenant responded that it is 'my understanding that such notice was provided while negotiating the lease already and is not on [a] month to month basis.' He elaborated that '[t]hose laws and regulations and notices you mentioned . . . do give me relie[f] so I don't stress my other businesses and carry the rent as unpaid.' Thus, the 'answer to your question' about whether extenuating circumstances exist 'is Yes.' The Tenant also informed the property management company that he 'won't be able to make October rent.'"

(ER-71, alterations in original.)

14

**H.** **In April 2022, the district court rejected Iten's "extenuating circumstance" allegation as legally deficient and dismissed the amended complaint with prejudice.**

The County moved to dismiss the amended complaint. (Dkt.-33.) The district court, noting federal courts must independently examine their own jurisdiction, ruled that the complaint must be dismissed with prejudice because Iten's "somewhat tortured recitation of his tenant's statements does not sufficiently allege that the tenant has complied with or is exempt from the [Resolution's] notice provisions or, thus, that the [Resolution's] protections apply to the tenant." (ER-9, 12.)[2]

The court reasoned: "Although the [Resolution] does not itself define 'extenuating circumstances,' there can be little doubt that mere recitation of those magic words is insufficient to invoke the [Resolution's] protections or to exempt tenants from the modest requirement that they self-certify a COVID-related inability to pay rent within seven days after the rent is due." (ER-9-10.) The court also rejected Iten's argument, raised at oral argument, that the Tenant's statement should be considered a "good faith mistake of law" and that such a mistake is an extenuating circumstance obviating the need for proper notice. (ER-10; *see* ER-19,

---

[2] The County did not raise the standing issue in its papers regarding the second motion to dismiss, but its counsel made clear at oral argument that "[w]e did not concede [standing]" and "there is no concession by the County in . . . our moving papers." (ER-23-24; *see also* ER-18.)

22, 24.)  The court noted that the amended complaint does not "specifically allege that the tenant gave any notice during the lease re-negotiation process of any COVID-related inability to pay rent" but that, regardless, even assuming Iten could so allege, "the provision of such notice prior to signing a five-year lease cannot reasonably be read to satisfy the tenant's ongoing, indefinite, and relatively minimal burden to certify that COVID-19 was continuing to affect his ability to pay rent."  (ER-11, underlining in original.)

Iten's argument, the court recognized, would effectively eliminate the notice requirement:  "[Iten's] reading of the term 'extenuating circumstances' . . . would encompass any unreasonable mistake of law, so long as the error was made in 'good faith.'  Even assuming that landlords such as [Iten] are in any position to gauge the sincerity of their tenant's beliefs, such a reading of 'extenuating circumstances' is so broad as to render the [Resolution's] notice provision almost meaningless."  (ER-11.)

The court dismissed Iten's complaint with prejudice.  (ER-12.)

## I.     The Resolution expired on January 31, 2022 as to commercial evictions; Iten has sued for unlawful detainer.

The Resolution expired on January 31, 2022 as to commercial evictions.  (2-RJN-270.)  The Tenant must repay Iten, by January 31, 2023, all prior unpaid rent protected by the Resolution.  (2-RJN-276.)  Iten already has filed an unlawful

detainer action against the Tenant.  (AOB-10 n.3.)  Iten also has the right to sue the Tenant for breach of contract, but it is unclear whether he has done so.

## SUMMARY OF ARGUMENT

*Standing*.  The district court properly dismissed Iten's amended complaint for lack of standing.  It correctly recognized that if the Resolution did not prevent Iten from evicting the Tenant, the Resolution cannot have caused Iten injury and he lacks standing to sue.  Iten has admitted that the Tenant *never* complied with the Resolution's requirements to provide Iten with notice of a COVID-19-inability to pay within seven days "after the date the rent was due, unless extenuating circumstances exist."  He instead alleged that the Tenant never knew about the monthly requirement and that a "good faith mistake of law" should count as "extenuating circumstances."  As a matter of law, Iten is wrong.

The Resolution's "extenuating circumstances" language is directly tied to the giving of notice within seven days, thus connoting a reasonable *inability* to give timely notice, such as being ill.  Iten's construction would render the notice requirement virtually meaningless.  It also runs afoul of the very cases Iten relies on in his brief, cases analyzing a "mistake of law" for purposes of California Code of Civil Procedure, section 473 ("section 473").  Under section 473 law, a person cannot claim an "honest" or "excusable" mistake when the alleged mistake results from ignorance of the law or lack of knowledge of the rules.  Tenants and

landlords are presumed to know the law, including municipal laws. Iten cannot manufacture standing by claiming his Tenant never understood the Resolution.

Iten also lacks standing for another reason. Iten's Contracts Clause claim rests on a 5-year lease that he executed in August 2020 while the Resolution already was in effect. Iten could have ended his relationship with the Tenant at that time but instead allegedly chose to enter that contract based on speculative assumptions that it would be the best way to recover past-due rent. Case law prohibits plaintiffs from manufacturing standing through self-inflicted injuries, even those resulting from genuine fears or speculation about future events.

***Merits***. And even if there were standing, Iten's claims *still* would fail because his allegations do not meet either of the two independent steps for establishing a Contracts Clause violation. Iten cannot meet the threshold test of showing a substantial impairment of his contract with the Tenant because Iten executed that contract when the Resolution already was in effect. A contract cannot be impaired for Contracts Clause purposes by a law already in effect when the contract was made; moreover, laws existing when a contract is made are deemed part of the contract. As a matter of law, that precludes Iten from meeting the substantial-impairment test.

Nor can Iten meet the second step for a Contracts Clause claim: proving that the Resolution was *not* drawn in an "appropriate" and "reasonable" way to advance a significant and legitimate public purpose. Iten concedes that combatting the impact of COVID-19 is a legitimate purpose. He only argues that a commercial-

18

eviction moratorium is an inappropriate and unreasonable way to do so. But this Circuit's precedent, including a recent decision upholding a City of Los Angeles COVID-19 residential-eviction moratorium, requires this Court to defer to the County's judgment as to the reasonableness of its provisions, and to not second-guess the County. Iten's Contracts Clause arguments fail for this reason too.

*Jurisdictional discovery*. Iten claims that the district court should have let him conduct jurisdictional discovery, rather than dismissing his amended complaint with prejudice. But Iten never requested jurisdictional discovery in the district court or identified any proposed amendment. And his belated "jurisdictional discovery" comments are irrelevant because Iten only offers a speculative hunch or belief that maybe he might find something, which is never enough. In any event, any amendment to the complaint would be futile given the inherent flaws in Iten's claims.

## STANDARD OF REVIEW

This Court reviews the grant of a motion to dismiss de novo. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 839 (9th Cir. 2020). When a district court does not identify why it dismissed "with prejudice," this Court examines de novo the decision not to allow leave to amend. *Schmier v. U.S. Ct. of Appeals for Ninth Cir.*, 279 F.3d 817, 824 (9th Cir. 2002).

The Court may affirm on any ground supported by the record, regardless of whether the district court relied on it. *Daniels-Hall*, 629 F.3d at 998.

Courts assessing a motion to dismiss must only accept well-pleaded factual allegations as true, not conclusory allegations or allegations that merely state a legal conclusion even if couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *U.S. ex rel. Chunie v. Ringrose,* 788 F.2d 638, 643 n.2 (9th Cir. 1986). Courts must not assume that the plaintiff "can prove facts that it has not alleged or that the defendants have violated . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 526 (1983).

# ARGUMENT

## I. The District Court Correctly Dismissed Iten's Amended Complaint For Lack Of Standing.

### A. Iten must allege facts sufficient to confer standing.

As the U.S. Supreme Court "ha[s] explained, '[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)). "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Id.* at 409 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).)

Iten, as "[t]he party seeking to invoke the jurisdiction of the federal courts, has the burden of alleging *specific facts* sufficient to satisfy these three elements." *Schmier,* 279 F.3d at 821 (emphasis added). "[P]laintiffs must satisfy standing requirements 'based on the complaint . . . .'" *Id.* (quoting *Raines,* 521 U.S. at 818.) "'A federal court is powerless to create its own jurisdiction by embellishing

otherwise deficient allegations of standing.'" *Id.* (quoting *Whitmore v. Arkansas,* 495 U.S. 149, 155-56 (1990).)

To have standing to challenge the Resolution, Iten must allege facts sufficient to establish, if proven, that the Resolution actually protected the Tenant and actually prevented Iten from evicting the Tenant. If the Tenant never complied with the Resolution's prerequisites for tenants to obtain protection under the Resolution, Iten cannot demonstrate standing. As the district court correctly put it, "if the [Resolution] does not prevent [Iten] from evicting his tenant, then as a matter of course, the [Resolution] cannot have caused [Iten] any injury, and he lacks standing to bring suit." (ER-8.)

Other federal courts construing landlord challenges to COVID-19-related eviction moratoriums have done exactly what the district court did here: grant a motion to dismiss a complaint on standing grounds where the allegations did not establish that the tenant satisfied the prerequisites to claiming protection under the eviction moratorium. *See Apartment Owners Advisory Council v. Marks*, No. 21 CV 10175 (VB), 2022 WL 4357951, at *5 (S.D. N.Y. Sept. 20, 2022) (holding plaintiff Grassy Sprain "has not alleged an injury traceable to [a New York COVID-19 eviction moratorium] and therefore has not demonstrated standing to challenge them" because "it does not allege [the tenant] has filed a hardship declaration or that Grassy Sprain has obtained a default judgment against him which was vacated or it is otherwise unable to enforce").

As we show below, the district court correctly ruled that Iten failed to establish standing because his allegations failed to show that the Tenant complied with the Resolution's notice requirements. (§ I.B.) And dismissal for lack of standing is also proper for another reason: Iten could have ended his relationship with the Tenant in August 2020 but instead chose to enter the contract on which his Contract Claims rest based on speculative assumptions about the future. (§ I. C.)

**B.    Iten lacks standing because he failed to allege a sufficient "extenuating circumstance" for the Tenant's violation of the seven-day notice requirement.**

**1.    An extenuating circumstance for not complying with the seven-day notice requirement is an *inability* to timely comply, not a purported "mistake of law" for *never* complying.**

From enactment through expiration, the Resolution has prevented a commercial landlord from evicting a commercial tenant for nonpayment of rent, late charges, or other fees *only if* the tenant complies with two prerequisites:

(1)    the tenant demonstrates an inability to pay due to COVID-19 related financial impacts, the COVID-19 state of emergency or government-recommended COVID-19 precautions, *and*

23

(2)     the tenant provides notice to the landlord "within seven (7) days after

the date" *the rent or related charges were due*, "unless extenuating

circumstances exist, that the [t]enant is unable to pay."

(*See, e.g.,* 1-RJN-15, 38, 51, 70, 113, 156, 182, 212-213, 238) (emphasis added).

Because the Tenant owed Iten a rental payment at the start of each month,

the Tenant was supposed to provide notice to Iten of any COVID-19-related

inability to make that payment within seven days of the start of each month "unless

extenuating circumstances exist."  But Iten's complaint concedes that the Tenant

*never* gave the required monthly notice.  (*See* ER-71 ["The Tenant has not

provided timely monthly notice of the inability to meet the lease's payment terms

because of a qualifying COVID-related reason, as generally required under the

County's eviction moratorium"].)  Iten therefore lacks standing to challenge the

Resolution unless his amended complaint alleges facts sufficient to demonstrate

that "extenuating circumstances" exist for the Tenant's failure to provide timely

notice.  As a matter of law, Iten failed to do so.

The Resolution has no general provision excusing landlords or tenants from

complying with the Resolution's requirements or conditions when "extenuating

circumstances" exist.  Instead, the only "extenuating circumstances" exception

appears in the sentence that the Tenant must provide notice of a COVID-19-related

inability to pay within seven days after the date a rental payment (or related

charge) is due.  That provision directly ties the "extenuating circumstance" to the

failure to give the notice within the required seven days.

24

Reading that sentence logically and in its entirety, extenuating circumstances must exist for missing the seven-day window for a particular due date—that is, for providing late or delayed notice for a particular due date, as opposed to the Tenant's situation here of *never* providing *any* timely notice after *any* payment due date during the *entire* period covered by the Resolution. A proper extenuating circumstance for failing to give timely notice within the required seven-day period would be a legitimate reason for *not being able* to provide notice, such as being on vacation, being sick or in the hospital, being out of town on work, or a delay resulting from a problem with mail delivery. *See, e.g., Kruser v. Bank of Am.*, 281 Cal. Rptr. 463, 465 (Ct. App. 1991) (analyzing federal banking statute requiring consumer to report loss or theft of bank card within two business days '"or in extenuating circumstances *such as extended travel or hospitalization*, within a longer period which is reasonable under the circumstances'"; court found no extenuating circumstance to excuse plaintiff's non-compliance because nothing "prevented" timely compliance) (italics added).

Iten, however, did not allege that the Tenant was unable to provide timely compliance. (*See* ER-21 [district court noting Iten is not claiming that the Tenant said "something along the lines of, I was out of town . . . . I put [a notice] in the mail, but it got there a little bit late[,] I was in the hospital[,] . . . there's some reason that goes to my ability to provide notice in a timely manner"].) Instead, after the district court dismissed Iten's initial complaint with leave, Iten asked the Tenant whether it could think of any "extenuating circumstance" and all the Tenant

could offer was the assertion that its "understanding" was that it gave notice when negotiating the new September 2020 lease and that it did not understand it needed to provide monthly notice. (ER-71.)

Those assertions, however, are contrary to the Resolution's plain language. Iten's claim thus reduces to the notion that the purported "extenuating circumstance" is that the Tenant violated the Resolution's requirements but, because the Tenant never bothered reviewing the Resolution, the Tenant never knew or understood its requirements. That's not a proper excuse. "All citizens are presumptively charged with knowledge of the law . . . ." *Atkins v. Parker*, 472 U.S. 115, 130 (1985); *accord In re Estate of Dye*, 112 Cal. Rptr. 2d 362, 368 (Ct. App. 2001) ("[i]t is presumed citizens know the law"). This includes municipal laws, such as the Resolution. *City of West Hollywood v. Beverly Towers, Inc.*, 805 P.2d 329, 335 (Cal. 1991) (en banc) ("there is a general presumption that each person knows the governing law"; therefore, "an ordinance of general applicability . . . imparts constructive notice of its terms to parties" subject to the ordinance); *1119 Delaware v. Cont'l Land Title Co.*, 20 Cal. Rptr. 2d 438, 444 (Ct. App. 1993) ("an ordinance of general application, such as an ordinance regulating condominium conversions, imparts constructive notice of its terms to the public").

And it would be particularly unreasonable and inappropriate for a party to *specifically rely* on a particular law as providing protection but never bother to examine that law's requirements and conditions, as the Tenant allegedly did here. Also, nothing precluded Iten himself from providing a copy of the Resolution to

the Tenant, explaining its terms, or demanding that the Tenant comply with the Resolution's requirements. Indeed, the Resolution eventually (by June 2021) required landlords to provide tenants with less than ten employees notice of their rights under the Resolution, but Iten never did. (*See, e.g.,* 1-RJN-178, 183.)

Iten, nonetheless, argues that the Tenant's failure to *ever* comply with the Resolution's notice requirement equates to a "good faith" "genuine mistake of law," and that such a mistake of law should be considered an "extenuating circumstance" under the Resolution's notice provision. (AOB-17-20.) As the district court correctly recognized in rejecting the same argument, this interpretation of "extenuating circumstances" reads the notice requirement out of existence: "Even assuming that landlords such as [Iten] are in any position to gauge the sincerity of their tenant's beliefs, such a reading of 'extenuating circumstances' is so broad as to render the [Resolution's] notice provision almost meaningless." (ER-11.) The so-called good faith mistake here was not just a mistake that caused a delay in compliance with the seven-day notice required for a particular rent payment. It was a "mistake" that resulted in a wholesale abdication of the notice requirement. The Tenant *never* complied with the requirement.

Iten misses the point in arguing that one particular dictionary definition "equates 'extenuating circumstance' with 'mitigating circumstance,' which in turn is defined in pertinent part as an 'unusual or unpredictable event that prevents performance.'" (AOB-17-18.) Those dictionary definitions focus on an *event* that *prevents* performance. But Iten has never alleged (or otherwise identified at oral

27

argument or elsewhere) any "event" that "prevented" the Tenant from providing the required monthly notice within seven days, such as a hospitalization or vacation. Nor has he even alleged an "unusual" or "unpredictable" event that prevented performance with the notice provision. Instead, he alleges that the Tenant never provided timely monthly notice, *despite the ability to do so*, because the Tenant never understood the Resolution's requirements. That's not an event that prevented timely compliance. If it were, the notice requirements of the Resolution or in any other municipal rule or ordinance would become, as the district court recognized, "almost meaningless" (ER-11) because persons violating the requirement could simply claim they never read or understood the rules.

### 2. Caselaw defeats Iten's construction.

Iten also argues, again ignoring that the Resolution directly ties the "extenuating circumstances" to the failure to give the required seven-day notice, that his "reading" of "extenuating circumstances" is "consistent with how California law in other contexts treats mistakes of law." (AOB-18.) He relies solely on cases discussing "mistakes of law" for purposes of section 473. (AOB-18-19.) Iten gets it exactly backwards. Section 473 law defeats his construction.

For starters, section 473 regards relieving a party from an adverse judgment, dismissal or legal ruling based on an attorney's excusable mistake; it is not a statute about relieving citizens of their duty to know and comply with the law.

28

In any event, Iten distorts section 473 law when he cites commentary that "'[a]n honest mistake of law'" is grounds for section 473 relief "'when the legal problem 'is complex and debatable.'" (AOB-18 (quoting *State Farm Fire & Cas. Co. v. Pietak*, 109 Cal. Rptr. 2d 256, 263 (Ct. App. 2001) and *McCormick v. Bd of Supervisors*, 243 Cal. Rptr. 617, 621 (Ct. App. 1988)).) This principle only applies to an attorney's "reasonable *misinterpretation*" of a statute or rule that he or she analyzed. *Pietak*, 109 Cal. Rptr. 2d at 263 (emphasis added); *accord*, *McCormick*, 243 Cal. Rptr. at 622 (rule applies to "[r]easonable errors in *construing* a statute") (emphasis added).) It doesn't apply to an attorney's (or anyone else's) failure to comply with a law because they failed, as is true of the Tenant here, to even read or analyze the applicable law.

The cases that Iten cites explain that a person *cannot* claim an "honest" or "excusable" mistake when "'the alleged mistake of law is the result of professional incompetence based upon erroneous advice [citation], *general ignorance of the law or lack of knowledge of the rules* [citation], or unjustifiable negligence in the *discovery or research of the law*, laxness or indifference . . . .'" *Pietak*, 109 Cal. Rptr. 2d at 263-64 (alterations in original) (emphasis added); *accord McCormick*, 243 Cal. Rptr. at 361 ("in considering whether attorney error constitutes excusable neglect, the court must consider the attorney's overall diligence").

Here, the Resolution's notice requirement is not complex or debatable. Its plain meaning requires notice within seven days of each payment date. Iten is not claiming that the Tenant reasonably misinterpreted that language. He is claiming

29

that the Tenant blew the notice requirement because it never knew about or understood that requirement. But "ignorance of the law or lack of knowledge of the rules" is *not* an excusable mistake under Section 473. *Pietak*, 109 Cal. Rptr. 2d at 264; *see McCormick*, 243 Cal. Rptr. at 622 ("mere ignorance of the law coupled with a negligent failure to look it up does not constitute excusable neglect").

Iten similarly errs in citing *Cmty. Youth Athletic Ctr. v. City of Nat'l City*, 164 Cal. Rptr. 3d 644, 691-92 (Ct. App. 2013) for the proposition that "[i]t is quite plausible that a California court would find that Iten's tenant's mistake— essentially a type of due-date error—was excusable." (AOB-18.) That case involved two potentially applicable "inconsistent rules and provisions," one indicating a 60-day deadline and another indicating a 30-day deadline; the attorney mistakenly but reasonably thought the longer one applied. *See Cmty. Youth Athletic Ctr.,* 164 Cal. Rptr. 3d at 692.

That's not the issue here. Here, there's only one deadline—the seven-day notice requirement. Iten is not claiming that the Resolution stated a different notice period elsewhere or that some other County resolution so indicated, or that the Tenant complied with some other, inconsistent deadline. He is simply trying to side-step the Tenant's alleged ignorance of the law, which he cannot do. *Pietak*, 109 Cal. Rptr. 2d at 264; *McCormick*, 243 Cal. Rptr. at 622; *see also Hopkins & Carley v. Gens*, 135 Cal. Rptr. 3d 1, 10 (Ct. App. 2011) (an "honest mistake of law" is not a ground for relief where "the record shows only 'ignorance of the law coupled with negligence in ascertaining it'") (citation omitted); *Hanooka v. Pivko*,

28 Cal. Rptr. 2d 70, 77 (Ct. App. 1994) (alleged mistake of law inexcusable where statute "gave appellants the guidance which they assert they lacked").

### 3. The notice requirement protects landlords.

Iten further confuses matters by arguing that the "district court's landlord-friendly interpretation of the 'extenuating circumstances' provision is contrary to the moratorium's purpose." (AOB-21, bold omitted.) Iten seemingly assumes that because the Resolution was enacted to prevent some evictions, then its remedial purpose mandates construing every provision against landlords in the broadest fashion imaginable. (AOB-21-23.)[3] That proves too much. Yes, the County sought to prevent *certain* evictions. But it did not prohibit *all* evictions. The notice provision plainly balances the interests of landlords and tenants. It doesn't let tenants simply stop paying rent and call it a day for so long as the Resolution remains in effect. The notice provision protects *landlords* in requiring tenants to give notice after *each* payment due date of *a COVID-19-related* inability to make a particular payment.

---

[3] Iten notes that the Resolution applies to residential tenants and then argues that some residential tenants might lack legal sophistication and only understand English as a second language. (ER-20.) But Iten has never sought to enjoin the Resolution; he has sought damages and must show that the Resolution injured *him*. Nor would Iten, as a commercial landlord, have standing to challenge the Resolution's application to residential tenants. Regardless, there is no rule that non-sophisticated individuals or English-as-a-second-language speakers can avoid legal requirements. *See, e.g.*, *Nwosu v. Uba,* 19 Cal. Rptr. 3d 416, 430-31 (Ct. App. 2004) (persons in pro per bound by same rules as attorneys and represented parties). Such a rule would produce chaos.

The notice provision recognizes that an ability to pay or not pay during the pandemic can change between payment periods. Just because the pandemic continues wouldn't necessarily mean that a tenant couldn't make any particular payment, let alone that any inability to pay was COVID-19-related. That's particularly true where, as here, the Tenant is an essential business that remained open throughout the period covered by the Resolution, and the Tenant and other businesses had access to government financial support, such as forgivable PPP loans and County small business loans. *See, e.g.*, 15 U.S.C.A. § 636m (PPP loan may be fully forgiven if used for rent, payroll rent and utilities) (*see also* 1-RJN-17-18, 55-56 [Resolution provisions specifying that County departments must assist small businesses with confronting "economic instability," including obtaining Small Business Administration loans and County small business loans, and create a small business resource toolkit]). Construing the "extenuating circumstance" language so broadly as to excuse a tenant who *never* gave timely notice would gut the notice provision and undermine its purpose of protecting landlords.

### 4. The County never agreed with Iten's construction.

Iten argues that "the County's litigation conduct in this very case" supports the notion that "the County intended the extenuating circumstances exception to be understood broadly to include tenants like Iten's . . . ." (AOB-20.) The argument is spurious.

32

Iten bases his argument on the decision of the attorneys representing the County to assert a standing argument in their motion to dismiss Iten's original complaint but to only assert a Contract Clause argument in their motion to dismiss his amended complaint. (AOB-21.) But that wasn't an interpretation of the "extenuating circumstances" provision. The attorneys did not write the Resolution; they are not Board members; and they are not County employees entrusted with implementing the Resolution. They explained to the district court that they merely decided that attacking the "extenuating circumstance" allegation might "go[] beyond the complaint" because "there's no detail behind [the allegation]." (ER-16, 18.) They made it clear that they "did not concede" standing, that they simply felt their time "was better spent" on the Contracts Clause arguments, and that their motion was *not* a "concession or admission" that the "extenuating circumstance" allegation "complies with the intent of the [Resolution]." (ER-23.) The County's attorneys also argued at the hearing that the Resolution contains guidance that the notice provision means "unless extenuating circumstances exist *that prevent the tenant from providing timely notice*, including but not limited to the tenant's illness or the illness of a family member for whom the tenant is providing care." (ER-23-24, emphasis added.)

Put simply, "there [wa]s no concession by the County . . . ." (ER-24.) The motion to dismiss does not equate to a County construction of the Resolution. No authority treats such litigation conduct as an interpretation of a law. Although Iten cites *Craik v. Cty. of Santa Cruz*, 96 Cal. Rptr. 2d 538, 545 (Ct. App. 2000) for the

33

proposition that courts will "'defer to [a] defendant's construction of its own ordinance'" (AOB-21), *Craik* involved a municipality's *administrative* findings during an administrative proceeding, 96 Cal. Rptr. 2d at 542-44. That has nothing to do with the context here.

**C.    Iten lacks standing because he could have ended his relationship with the Tenant at the end of August 2020, instead of executing the contract on which his claim rests.**

Dismissal for lack of standing is appropriate here for another reason: Not only did the Tenant never comply with the Resolution's prerequisites for claiming protection, the complaint's allegations establish that Iten could have ended his relationship with the Tenant in August 2020 but instead chose to enter into a new 5-year lease that superseded the prior lease. Although the district court never considered this ground in dismissing Iten's complaint, this Court has "an independent obligation 'to examine jurisdictional issues such as standing [sua sponte],'" *Wilson v. Lynch*, 835 F.3d 1083, 1090 n.2 (9th Cir. 2016) (original brackets) (citation omitted) , and it may affirm a dismissal on any ground supported by the record, *Daniels-Hall*, 629 F.3d at 998.

Iten could have ended his relationship with the Tenant when the prior 5-year lease ended at the end of August 2020. (ER-70.) If the Tenant had refused to leave, Iten could have evicted him and sued for breach of contract—without running afoul of the Resolution. Instead, Iten chose to enter into a new 5-year

lease directly with the Tenant (who formerly was a sub-lessee) and to incorporate payment of any past-due rent into the new lease's payment terms, thus superseding the prior lease and rendering it irrelevant. (ER-70.) Iten's complaint admits that given the Tenant's history of lease breaches, including untimely rent payments and "unauthorized 'improvements' of the property resulting in building code violations," Iten "would have preferred to end his business relationship with the Tenant when the lease expired at the end of August 2020" but he "concluded that he had no prudent course of action open to him other than to negotiate a new lease with the Tenant *so as to increase the chances of someday recovering the past-due rent*." (ER-70, emphasis added.)

Besides ignoring that Iten *did* have another prudent course permitted by the Resolution—end the relationship and, if necessary, evict and sue for breach of contract—Iten's speculation that the Resolution made a new lease his only prudent option to recover the past-due rent is not a sufficient basis for conferring standing. *See Marks*, 2022 WL 4357951, at *5 (allegations that plaintiffs did not challenge tenants' reliance on eviction moratorium "based on [their] speculative fear that any such effort would be unsuccessful . . . is insufficient to confer standing" (citing *Clapper*, 568 U.S. at 417-18)). The Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]legations of *possible* future injury' are not sufficient" to confer Article III standing. *Clapper*, 568 U.S. at 409 (alteration and emphasis in original) (citations omitted).

35

The *Clapper* plaintiffs, for example, alleged a reasonable likelihood that the government would intercept their communications with non-U.S. citizens under a particular statute they claimed was unconstitutional; in reliance on their understanding of the statute, they undertook costly and burdensome measures to protect confidentiality. *Clapper*, 568 U.S. at 401-02. The Supreme Court found no standing because (a) plaintiffs could only speculate about potential future surveillance interception and thus injury was not "certainly impending" even if there was "an objectively reasonable likelihood" of future interception; and (b) plaintiffs could not use their incurring of actual costs based on a reasonable fear of future surveillance to confer standing. *Id.* at 410-11, 415-16. As the Court put it, plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending . . . . If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." *Id.* at 416.

The same is true here. Iten could have ended his relationship with the Tenant in August 2020 and sued for breach of contract. He instead chose to enter into the new 5-year lease based on speculation about what might be the best way to recover the past-due rent. In fact, his speculation is internally inconsistent: He alleges that he concluded a new lease might increase his "chances of someday recovering the past-due rent" (ER-70) yet elsewhere alleges that "the longer a debt is not collected, the greater the chance that a debtor will become judgment proof or

will not be locatable" (ER-74).  Iten cannot manufacture standing with the self-inflicted injury of entering into a new lease when he didn't have to and then suing the County for allegedly impairing that lease.

## II.    Iten Failed To State A Viable Contracts Clause Claim.

Regardless of whether standing exists, this Court can and should affirm the dismissal on the alternative ground that the complaint's allegations do not establish a viable claim for violation of the Contracts Clause.  *Daniels-Hall*, 629 F.3d at 998 (circuit court should affirm a dismissal on any ground supported by the record).

Iten's claims rest solely on an alleged violation of the Contracts Clause. (*See* ER-63-78.)  As a matter of law, his Contracts Clause argument is not viable.

### A.    The governing review standards entitle the County to deference.

#### 1.    This Circuit's recent, binding COVID-19 eviction-moratorium Contracts Clause case confirms that the review standard is deferential to the County.

The Contracts Clause prohibits states from passing laws "impairing the Obligation of Contracts." U.S. Const. Art. I, § 10.  But the Clause is not the "Draconian provision that its words might seem to imply."  *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978).  Instead, courts narrowly construe the Contracts Clause, as this Circuit recently confirmed in *Apartment Assoc. of Los Angeles Cnty., Inc. v. City of Los Angeles,* 10 F.4th 905, 912 (9th Cir. 2021)

37

(*Apartment Association*) in upholding a City of Los Angeles COVID-19-related eviction moratorium that mirrors the County's moratorium in many respects.

This Court is not operating on a blank slate. *Apartment Association*'s explication of Contracts Clause standards controls. *See In re Findley,* 593 F.3d 1048, 1050 (9th Cir. 2010) ("'three judge panels of our Circuit are bound by prior panel opinions 'unless an en banc decision, Supreme Court decision or subsequent legislation undermines those decisions'") (citation omitted).

As *Apartment Association* explicates, "[f]or the first 150 years of American legal history, the Contracts Clause imposed consequential limitations that federal courts routinely deployed to invalidate state and local legislation." *Apartment Association*, 10 F.4th at 912. But "[a]ll of that changed with *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398 . . . (1934), the watershed decision . . . on which the modern interpretation of the [Contracts Clause] rests." *Id.* (third and fourth alterations in original) (internal quotation marks omitted) (quoting Richard A. Epstein, *Toward a Revitalization of the Contract Clause*, 51 U. Chi. L. Rev. 703, 735 (1984)). In *Blaisdell*, the Supreme Court "upheld Minnesota's statutory moratorium against home foreclosures, in part, because the legislation was addressed to the legitimate end of protecting a basic interest of society." *Apartment Association*, 10 F.4th at 912 (internal quotation marks omitted) (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 503 (1997) (*Keystone Bituminous*) and *Blaisdell*, 290 U.S. at 445)).

38

"*Blaisdell* marked the beginning of the Supreme Court significantly curtailing the Contracts Clause's prohibitive force. As a result, the relevant cases today primarily consist of *Blaisdell* and its progeny, which set forth a very different conception of the Contracts Clause than in earlier cases." *Apartment Association,* 70 F.4th at 912 (citing numerous cases). "[C]ontemporary Supreme Court case law has severely limited the Contracts Cause's potency." *Id.* at 909. Post-*Blaisdell*, "the Supreme Court has construed [the Contracts Clause] narrowly in order to ensure that local governments retain the flexibility to exercise their police powers effectively." *Matsuda v. Cty. & Cnty. of Honolulu*, 512 F.3d 1148, 1152 (9th Cir. 2008).

"Perhaps most prominently, in *Energy Reserves Group v. Kansas Power and Light Co.*, 459 U.S. 400 . . . (1983), the Court clarified the modern approach to the Contracts Clause post-*Blaisdell*, articulating the flexible considerations courts must consider in a Contracts Clause case." *Apartment Association*, 10 F.4th at 912. *Energy Reserves Group* confirms that "when the government is not party to the contract being impaired, 'courts *properly defer to legislative judgment* as to the necessity and reasonableness of a particular measure.'" *Id.* at 913 (emphasis added) (quoting *Energy Reserves Group*, 459 U.S. at 412-13) (citing *Keystone Bituminous*, 480 U.S. at 505 and *Lazar v. Kroncke*, 862 F.3d 1186, 1199 (9th Cir. 2017)). Thus, while "[a] heightened level of judicial scrutiny is appropriate when the government is a contracting party," a deferential standard applies where, as here, the government is not. *Apartment Association*, 10 F.4th at 913.

39

*Apartment Association,* 10 F.4th at 913, also explains that the Supreme Court recently restated the Contracts Clause inquiry as a "two-step test" in *Sveen v. Melin*, 138 S. Ct. 1815 (2018). "Under *Sveen*'s formulation, [t]he threshold issue is whether the state law has operated as a substantial impairment of a contractual relationship." *Apartment Association,* 10 F.4th at 913 (citation and internal quotation marks omitted). "Factors relevant to that consideration include 'the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights.'" *Id.* (quoting *Sveen,* 138 S. Ct. at 1822).

"If the law is a substantial impairment, then the inquiry turns to the means and ends of the legislation." *Apartment Association,* 10 F.4th at 913 (internal quotation marks omitted) (quoting *Sveen,* 138 S. Ct. at 1822). "At that point, a court must determine whether the law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Apartment Association,* 10 F.4th at 913 (internal quotation marks omitted) (quoting *Sveen,* 138 S. Ct. at 1822 and *Energy Reserves Group*, 459 U.S. at 411-12).

Thus, the County's commercial-eviction resolution "must be upheld, even if it is a substantial impairment of contractual relations, if its 'adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption.'" *Apartment Association,* 10 F.4th at 913 (quoting *Energy Reserves Group*, 459 U.S. at 412).

40

And because Iten claims the benefit of the Contracts Clause and the County was not a party to the contract, Iten bears the burden of showing the Resolution is unreasonable and this Court also must defer to the County's judgment as to its reasonableness. *Apartment Association,* 10 F.4th at 913; *see also id.* at 911 (referencing "the deferential standard in Contracts Clause cases"); *id.* at 914 (referencing "the deferential standard that precedent constrains us to apply"); *id.* at 917 ("We are tasked only with evaluating the constitutionality of the eviction moratorium under the *forgiving standard* of modern Contracts Clause analysis") (emphasis added); *see also Keystone Bituminous*, 280 U.S. at 506 ("refus[ing] to second-guess" the legislature's determination of "the most appropriate ways of dealing with the problem"].)

### 2. *Jacobson* deference remains relevant.

*Apartment Association* makes clear that modern Contracts Clause jurisprudence requires deference to the County here. Yet Iten's opening brief largely ignores that deferential standard. Instead, Iten argues that "*Jacobson* deference is irrelevant to this action," referring to *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905). (*See* AOB-35-39, bold omitted.) *Jacobson* is not a Contract Clause case, and *Apartment Association* upheld the City of Los Angeles' eviction moratorium without even mentioning *Jacobson*. But while *Apartment Association* confirms that this Court need not rely on *Jacobson* to uphold the Resolution, that does not mean *Jacobson* deference is irrelevant.

*Jacobson* remains instructive because it involved a government law enacted to combat a virus outbreak and it further confirms that governments should be afforded broad deference in combatting COVID-19.  Numerous California courts have applied *Jacobson* deference in rejecting challenges to government restrictions on businesses imposed because of the COVID-19 epidemic.[4]

*Jacobson* upheld, against a substantive due process challenge, a 1905 Massachusetts law enacted during a smallpox outbreak that allowed local health boards to require adults to be vaccinated against smallpox.  197 U.S. at 12, 39.  It recognized: "Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members . . . .  [T]he court would usurp the functions of another branch of government if it adjudged, as matter of law, that the mode

---

[4] *See, e.g.*, *Cnty. of Los Angeles Dep't of Pub. Health v. Superior Ct. of Los Angeles Cnty.*, 275 Cal. Rptr. 3d 752, 759-61 (Ct. App. 2021) (*Cnty. of Los Angeles*) (applying *Jacobson* and progeny, and reconciling *Jacobson* with modern Supreme Court precedent, in upholding Los Angeles County emergency order temporarily banning outdoor restaurant dining); *Calm Ventures LLC v. Newsom,* 548 F. Supp. 3d 966, 975-76 (C.D. Cal. Jul. 13, 2021) (state restrictions on restaurant operations); *Pro. Beauty Fed'n of California v. Newsom,* No. 20-CV-04275, 2020 WL 3056126, at *5-7 (C.D. Cal. June 8, 2020) (California's Stay at Home Order as applied to hairdressers); *Altman v. Cnty. of Santa Clara*, 20-CV-02180, 2020 WL 2850291, at *6-8 (N.D. Cal., June 2, 2020) (county order that did not treat firearms retailer as "essential business"; collecting Ninth Circuit cases applying *Jacobson*); *Best Supplement Guide, LLC v. Newsom*, No. 20-CV-00965, 2020 WL 2615022, at *4 (E.D. Cal. May 22, 2020) (state and county orders closing gyms; collecting cases applying *Jacobsen*); *Gish v. Newsom*, No. EDCV 20-755, 2020 WL 1979970, at *4-5 (C.D. Cal. Apr. 23, 2020) (state and county physical distancing orders).

adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case." *Id.* at 27-28. Thus, government action "purporting to have been enacted to protect the public health, the public morals, or the public safety" in such an emergency is only susceptible to challenge if it "has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.* at 31. Courts cannot second-guess the government's approach to controlling the spread of disease unless the government takes an action "so arbitrary and oppressive . . . as to justify the interference of the courts to prevent wrong and oppression." *Id.* at 38.

Chief Justice Roberts cited *Jacobson* in support of his concurrence to a ruling denying a preliminary injunction against California's COVID-19 restrictions on religious gatherings. *See S. Bay United Pentecostal Church v. Newsom,* 140 S. Ct. 1613, 1613 (2020) (*Newsom*) (Roberts, J., concurring). He emphasized that "[o]ur Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" *Id.* (second alteration original) (citing *Jacobson*, 197 U.S. at 38). He further noted that "[w]hen those officials 'undertake[] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *Id.* (second alteration original) (*quoting Marshall v. United States*, 414 U.S. 417, 427 (1974)). "Where those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background,

43

competence and expertise to assess public health and is not accountable to the people." *Id.* at 1613-14.

Iten claims that the Chief Justice backed away from those comments in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (*Roman Catholic Diocese*), and that Justice Gorsuch has indicated that *Jacobson* does not permit "wholesale judicial abdication" during a pandemic. (AOB-38-39.) But Justice Roberts did not back away from his prior comments. He explained in his *Roman Catholic Diocese* concurrence that his comments in *Newsom* "should be uncontroversial." *Roman Catholic Diocese*, 141 S. Ct. at 75-76 (Roberts, J., dissenting). And contrary to Iten's assertion, the County is not contending that *Jacobson* provides "a blanket authorization for the government to do whatever it wants during the COVID pandemic." (AOB-37.)

*Jacobson* and recent Supreme Court cases can be "harmonize[d] . . . without difficulty": deference to government agencies is broad, but not unlimited. *Cnty. of Los Angeles*, 275 Cal. Rptr. 3d at 760. "The Supreme Court had ample opportunity to overrule *Jacobson* [in its recent COVID-19 cases] but did not." *Id.* Justice Kavanaugh has provided the following explanation, citing *Jacobsen*: "'[C]ourts should be *very deferential* to the States' line-drawing in opening businesses and allowing certain activities during the pandemic . . . . Under the Constitution, state and local governments, not the federal courts, have the primary responsibility for addressing COVID-19 matters . . . . But COVID-19 is not a blank check for a State to discriminate against religious people, religious organizations and religious

services. There are certain constitutional red lines that a State may not cross even in a crisis. Those red lines include racial discrimination, religious discrimination and content-based suppression of speech.'" *Id.* at 761 (first alteration in original) (quoting *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2614-15 (2020) (Kavanaugh, J., dissenting).[5] Those red lines are not at issue here.

*Jacobson* and its progeny confirm in general what *Apartment Association* confirms as a matter of Contracts Clause jurisprudence: The standard of review here is—and has to be—very deferential to the County.[6]

## B. The County's now-expired commercial-eviction provisions did not violate the Contracts Clause.

Applying *Sveen*'s two-step test with the required deference to the County, the now-expired County resolution on commercial evictions did not violate the Contracts Clause. Iten's complaint fails under either independent step.

---

[5] *See also Roman Catholic Diocese*, 141 S. Ct at 74 (Kavanaugh, J., concurring) ("Federal courts therefore must afford *substantial deference* to state and local authorities about how best to balance competing policy considerations during the pandemic . . . . But judicial deference in an emergency or a crisis does not mean wholesale judicial abdication, especially when important questions of religious discrimination, racial discrimination, free speech, or the like are raised.") (emphasis added) (citation omitted).

[6] Iten touts *Roman Catholic Diocese* as a "turning point for a shift in scrutiny." (AOB-39.) Not only does he overstate that case's significance, he ignores that it was not a Contracts Clause case; it only involved an application for an injunction of a New York law that discriminated against churches and synagogues.

### 1.    The Resolution did not substantially impair Iten's lease.

The threshold issue under *Sveen*'s test is whether the Resolution's commercial-eviction provisions substantially impaired Iten's contractual relationship with the Tenant.  *Sveen*, 138 S. Ct. at 1821-22; *Apartment Association*, 10 F.4th at 913.  In making that determination, this Court must consider the extent to which the Resolution undermined the parties' contractual bargain, interfered with Iten's reasonable expectations, and prevented Iten from safeguarding or reinstating his rights.  *Sveen*, 138 S. Ct. at 1822; *Apartment Association*, 10 F.4th at 913.

In *Apartment Association*, the Ninth Circuit chose to skip determining whether the eviction moratorium was "a substantial impairment of contractual relations, because even assuming it [wa]s, given the challenges that COVID-19 presents, the moratorium's provisions constitute an 'appropriate and reasonable way to advance a significant and legitimate public purpose.'"  10 F.4th at 913 (quoting *Sveen*, 138 S. Ct. at 1822).  Starting with the second step of the *Sveen* test and affirming on that basis is an option here.  But this Court should address the first step.  Given the particularities of Iten's complaint, as a matter of law Iten irrefutably cannot meet the substantial-impairment test.

That's because the contract that Iten claims the County interfered with is the lease he executed with the Tenant *at the end of August 2020*, when the pandemic

46

was raging and the Resolution *already was in effect*.[7]  That compels dismissal of his Contracts Clause claim.  A "'contract . . . cannot be impaired by a law in effect at the time the contract was made.'"  *Comty. Housing Improvement Program v. City of New York,* 492 F. Supp. 3d 33, 53 (E.D. N.Y. Sep. 30, 2020) (alteration in original) (quoting summary order in *Harmon v. Markus*, 412 F. App'x 420, 423 (2d Cir. 2011) (rejecting Contracts Clause claim).  Obviously, Iten could "foresee" resolution provisions already in effect.  *See S. California Rental Housing Ass'n v. Cnty. of San Diego*, 550 F. Supp. 3d 853, 862 (S.D. Cal. 2021) ("The regulations that halted evictions which were passed during the early days of the pandemic could not have been predicted by landlords, however, the Ordinance at issue followed the issuance of many similar regulations.  As such it was foreseeable . . . .").

Moreover, "'[l]aws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms.'"  *Norfolk and W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 130 (1991) (quoting

---

[7] The lease that Iten had when the Resolution first took effect in March 2020 has expired, and Iten rendered that contract irrelevant and eliminated any basis for a breach-of-contract or other claim under it when he incorporated any past-due rent into the new lease.  (ER-70-71.)  That's why Iten seeks damages "under his September 2020 lease."  (AOB-39.) And even under the Eighth Circuit's view that *Jacobson* deference only applies to the "early days of the pandemic," such deference would have applied to Iten's lease in effect in March 2020, as well as the new lease he executed in August 2020.  *See Heights Apartment, LLC v. Waltz,* 30 F.4th 720, 726-27 (8th Cir. 2022) (*Heights Apartments*) (*see also* AOB-39).

*Farmers' and Merch. Bank of Monroe, N.C. v. Fed. Rsrv. Bank of Richmond*, 262 U.S. 649, 660 (1923)); *accord 2 Tudor City Place Assocs. v. 2 Tudor City Tenants Corp.*, 924 F.2d 1247, 1254 (2d Cir. 1991) ("Laws and statutes in existence at the time a contract is executed are considered a part of the contract, as though they were expressly incorporated therein."). Thus, the Resolution's terms were effectively part of the new lease's terms.

Instead of parting ways with the Tenant at the end of August 2020, Iten chose to enter into a new five-year lease with his eyes wide open. He cannot claim that the Resolution "operated as a substantial impairment," *Sveen*, 138 S. Ct. at 1821-22, of a contract he executed knowing the Resolution was in effect. He cannot claim that the Resolution "undermine[d] the contractual bargain" struck in that lease or "interfere[d] with [his] reasonable expectations" or prevented him "from safeguarding or reinstating his rights" under that lease, *id.* at 1822, when that Resolution—as a current law—necessarily defined and shaped his rights under that contract. This defeats his Contract Clause claim as a matter of law. Even assuming other landlords might meet the substantial-impairment threshold to challenge the Resolution, Iten cannot.

The same is true even putting aside this case-specific fatal flaw in Iten's claim and examining how other courts evaluating COVID-19-related eviction moratoriums have analyzed the impairment issue. Numerous courts have rejected Contracts Clause claims on the basis that such moratoriums do *not* substantially impair leases. *See Gonzales v. Inslee*, 504 P.3d 890, 907 (Wash. App. Ct. 2022);

*Gallo v. District of Columbia*, No. 21-CV-03298, 2022 WL 2208934, *6-8 (D.

D.C. Jun. 21, 2022); *Jevons v. Inslee*, 561 F. Supp. 3d 1082, 1098-99 (E.D. Wash.

2021); *Auracle Homes, LLC v. Lamont,* 478 F. Supp. 3d 199, 224-25 (D. Conn.

2020) (*Auracle Homes*); *Elmsford Apartment Assoc., LLC v. Cuomo*, 469 F. Supp.

3d 148, 171-72 (S.D. N.Y. 2020) (*Elmsford*); *HAPCO v. City of Philadelphia*, 482

F.Supp.3d 337, 352-53 (E.D. Pa. 2020).  Those courts reasoned:

- The eviction moratorium does not permanently extinguish or

eliminate the landlord's contractual remedies for nonpayment of rent, but rather

merely postpones or delays the landlord's ability to exercise the eviction remedy

for nonpayment of rent.  *Gonzales*, 504 P.3d at 906; *Gallo,* 2022 WL 2208934, at

*6; *Elmsford*, 469 F. Supp. 3d at 172; *HAPCO*, 482 F. Supp. 3d at 352-53; *Auracle

Homes,* 478 F. Supp. 3d at 224-25; *Jevons*, 561 F. Supp. 3d at 1098-99.[8]

- Governments have heavily regulated the landlord-tenant industry over

the years, and such regulation puts landlords on notice that the government could

intervene in the future.  *Gonzales*, 504 P.3d at 906; *Gallo,* 2022 WL 2208934, at

*7-8; *HAPCO*, 482 F. Supp. 3d at 352; *Auracle Homes,* 478 F. Supp. 3d at 224-25;

---

[8] Although provisions barring landlords from charging interest or late fees during
the moratorium might be a permanent bar, courts have deemed the loss of such
fees/interest as not being a "substantial" impairment, *Hapco*, 482 F. Supp. 3d at
352 n.80, or as being an appropriate and reasonable way to advance a legitimate
public purpose, *Apartment Association*, 10 F.4th at 914 (upholding provision
barring late fees and interest as reasonable because late fees and interest could
further "'compound COVID-19 affected tenants' dilemmas, causing them to self-
evict or be evicted'").

*Jevons*, 561 F. Supp. 3d at 1099; *see also Energy Reserves Group.*, 459 U.S at 413-
14 (regulation did not substantially impair contract because "supervision of the
industry was extensive and intrusive").[9]

•      The moratorium was temporary and still gave landlords the ability
to safeguard their rights because after expiration they retained their remedies for
nonpayment of rent. *Gonzales*, 504 P.3d at 906; *HAPCO*, 482 F. Supp. 3d at 352-
53; *Jevons*, 561 F. Supp. 3d at 1098-99.

Although some courts evaluating COVID-19 eviction moratoriums have
disagreed with the above case law and found a sufficient impairment under *Sveen*'s
first step, they have relied on the reasoning that "a reasonable landlord would not
have anticipated a virtually unprecedented event such as the COVID-19 pandemic"
and the resulting eviction moratoriums. *Baptiste v. Kennedy*, 490 F. Supp. 3d 353,
384 (D. Mass. 2020); *accord Heights Apartments*, 30 F.4th at 729 (notwithstanding
prior housing industry regulations, nothing in Minnesota or Supreme Court law
"would have made the extent and reach of the [eviction moratorium orders]
foreseeable to [plaintiff]"); *Farhoud v. Brown*, No. 20-CV-2226, 2022 WL

---

[9] Iten tries to side-step this reasoning by claiming that while residential leases
"have traditionally been subject to significant government regulations . . .
commercial leases have no comparable history of regulatory control." (AOB-30.)
Although residential leases face more regulation, that doesn't mean commercial
landlords face none. *Melendez v. City of New York*, 16 F.4th 992 (2d Cir. 2021),
cited at AOB-30, does not say anything different. *Melendez* did not distinguish
between residential and commercial landlords; its point was that while New York
has "regulated its commercial real estate market," it has not regulated "personal
guarantees," which was the subject of the *Melendez* claim. *Id.* at 1034.

326092, *7–8 (D. Or. Feb. 3, 2022) (same under Oregon law).  Such reasoning has

no place where, as Iten did here, the landlord entered into the contract when the

eviction provisions were *already in effect*.

Iten's impairment argument fails as a matter of law.

> **2.  Even assuming the Resolution substantially impaired the lease, Iten's claim still fails because the Resolution was an appropriate and reasonable way to redress the turmoil caused by the COVID-19 pandemic.**

Even if Iten could somehow surmount the substantial-impairment hurdle, his

Contracts Clause claim still would fail because he cannot meet the second step of

the *Sveen* test—showing that the Resolution was not drawn in an appropriate and

reasonable way to advance a significant and legitimate public purpose.  *Sveen*, 138

S. Ct. at 1822; *Apartment Association*, 10 F.4th at 913.  Iten admits that "stopping

the spread of COVID-19 is a legitimate interest for which the County may

regulate."  (AOB-31.)  Nor does he dispute that the County faced an unprecedented

emergency.  He instead claims that the commercial-eviction moratorium was not

an "appropriate" or "reasonable" means of advancing "the goal of fighting the

pandemic."  (AOB-31.)

Although landlords across the country have brought Contracts Clause

challenges to COVID-19-based eviction moratoriums, courts have almost

universally upheld the moratoriums as appropriate and reasonable, even those that

51

found the landlord met the substantial-impairment threshold. *See, e.g.*, *Apartment Association*, 10 F.4th at 916-17; *Gallo*, 2022 WL 2208934 at *5-7; *Farhoud,* 2022 WL 326092 at *9; *Jevons*, 561 F. Supp. 3d at 1100-01; *Auracle Homes*, 478 F. Supp. 3d at 233-26; *El Papel LLC v. Durkan*, No. 20-CV-01323, 2021 WL 4272323, at *8-13 (W.D. Wash. Sep. 15, 2021), *report and recommendation adopted as modified*, No. 20-CV-01323, 2022 WL 2828685 (W.D. Wash. July 20, 2022); *Baptiste*, 490 F. Supp. 3d at 381-87; *HAPCO*, 482 F. Supp. 3d at 349-53; *Elmsford*, 469 F. Supp. 3d at 168-72.

The *only* exception to date is *Heights Apartments*, 30 F.4th 720—a split Eighth Circuit decision, where the majority found that a complaint's Contract Clause challenge to an eviction moratorium sufficed to get past the dismissal stage. But *Heights Apartments* is irrelevant here. It doesn't apply Ninth Circuit law. *See Heights Apartments, LLC v. Walz*, 39 F.4th 479, 481 (8th Cir. 2022) (order denying rehearing en banc; dissenting Eighth Circuit judges emphasizing that the decision "conflicts with a recent decision of the Ninth Circuit [*Apartment Association*] and decisions of every federal district court to consider the issue.") The subject moratorium also fundamentally differed from the County's. First, it had "no definite termination dates." *Id.* at 730; *see Gallo*, 2022 WL 2208934, at *6 (distinguishing *Heights Apartments* on that basis). Second, the *Heights Apartments* moratorium "prohibited *all* evictions rather than just those related to the pandemic's economic hardships." 30 F.4th at 731 (emphasis added). It thus protected lease breaches "unrelated to the nonpayment of rent" and even shielded

52

"behaviors [that] *undermined* efforts to combat the COVID-19 virus," such as "operating a car and boat shop [unlawfully] on the premises, holding raucous parties, and creating nuisances that drove other rent-paying tenants to move." *Id.* (emphasis added). None of that applies to the Resolution.

Indeed, the Los Angeles City moratorium upheld in *Apartments Association* mirrors the Resolution in terms of the provisions on which Iten bases his Contracts Clause claim against the County. (*See* ER-114, 119.) The City's moratorium—the same as the Resolution provisions at issue here—prevented landlords from evicting tenants during the moratorium for a COVID-19-related non-payment of rent or for a no-fault reason; prohibited landlords from charging late fees and interest during the moratorium; allowed landlords to seek to evict tenants based on a good-faith belief the tenants were not protected by the moratorium but provided tenants an affirmative defense to an unlawful detainer action; and gave tenants up to twelve months after the protection period ended to re-pay any properly-deferred rental payment. *Apartment Association,* 10 F.4th at 908-10. And in upholding the City's moratorium, this Circuit expressly rejected the same interpretation of, and reliance, on *Blaisdell*, 290 U.S. 398, that Iten advocates here. *See Apartment Association*, 10 F.4th at 914-16 (*see* AOB-13, 34).

Because *Apartment Association* upheld these same provisions against a Contracts Clause challenge, Iten tries to treat the case as irrelevant on the ground that it upheld *residential* eviction provisions whereas Iten is challenging the Resolution's *commercial-eviction* provisions. Iten's argument thus reduces to the

53

contention that while the provisions he attacks might suffice for a residential-eviction moratorium, no legitimate basis exists for a commercial-eviction moratorium. His contention, however, still amounts to the second guessing that *Apartment Association* prohibits. Because the County is not a party to the contract between Iten and the Tenant, this Court must defer to the County's judgment as to the necessity and reasonableness of the Resolution's commercial-eviction provisions. *Apartment Association*, 10 F.4th at 913; *Energy Reserves Group*, 459 U.S. at 413; *Keystone Bituminous*, 480 U.S. at 505.

The Resolution itself and other related Board motions explain that COVID-19's impact and threat to the public was not just limited to residential tenants. Commercial-eviction provisions were appropriate and reasonable because the "sudden and unexpected income loss" from COVID-19 left commercial tenants "unable to pay rent and vulnerable to eviction" and hindered businesses "from fulfilling their financial obligations, including paying rent and making public utility payments such as water and sewer charges." (1-RJN-14, 47-48, 50.) COVID-19 caused "serious financial impacts" to businesses, including "the substantial loss of income due to illness, business closures, loss of employment, or reduced hours, thus impeding their ability to pay rent[.]" (1-RJN-49.) The County had to close certain businesses for the public health, safety and welfare, but those shutdowns prevented businesses from using their property as intended and made it harder to pay rent. (1-RJN-49.) Displacement of commercial tenants unable to pay rent, and the resulting loss of jobs and pay to employees, also impeded

compliance with the County's "Stay at Home" and "Safer at Home" orders by further promoting housing instability and homelessness. (1-RJN-14, 49, 199.) Some of the County's commercial-eviction provisions treated smaller businesses (those with less than ten employees) more favorably than larger businesses in recognition that smaller businesses "are more likely to experience severe financial hardship due to Covid-19" and they collectively "make up the backbone of the [County's] local economy." (1-RJN-21.)

This Court must "refuse to second guess" the County's judgment. *Apartment Association*, 10 F.4th at 914; *Keystone Bituminous*, 480 U.S. at 506. That is particularly true given that the COVID-19 pandemic is an "'area[] fraught with medical and scientific uncertainties.'" *Cnty. of Los Angeles*, 275 Cal. Rptr. 3d at 765 (quoting *S. Bay United Pentecostal Church*, 140 S. Ct. at 1613 (Roberts, J., concurring).)

## III.    The District Court Properly Granted Dismissal With Prejudice.

Iten argues that the district court should not have dismissed his complaint with prejudice and instead "should have given Iten the opportunity to conduct limited jurisdictional discovery." (AOB-25.) He suggests, for example, that he should be allowed to subpoena the County's Department of Business Consumer Affairs for any records demonstrating when tenants successfully invoked the extenuating circumstances exception. (AOB-25-26.) The argument fails.

First, Iten never requested jurisdictional discovery, not at either hearing where the district court raised standing issues or at any other moment; nor did he request another chance to amend or identify the substance of any such amendment. (*See* ER-13-37.) Iten's reliance on *Boschetto v. Hansing*, 539 F.3d 1011 (9th Cir. 2008) (AOB-25) is misplaced because *Boschetto* confirms that "[a] district court's decision to permit or deny jurisdictional discovery is reviewed for abuse of discretion." *Boschetto*, 539 F.3d at 1020. Iten never asked the district court to exercise its discretion.

Second, any further amendment would be futile. The district court already afforded Iten the opportunity to amend his complaint once, and that amendment confirmed that the Tenant never complied with the Resolution and that Iten simply wants to avoid that non-compliance by alleging the Tenant made a mistake of law—an argument that fails as a matter of law. That Iten's claim rests on a contract that he executed while the Resolution already was in effect further defeats his claim as a matter of law, both on standing and merits grounds. No amendment could change that.

Third, Iten's belated request for jurisdictional discovery is a red herring. Subpoenaing the County's Department of Business Consumer Affairs or another County department would yield nothing: The County would never be a party to any unlawful detainer action, so its files would not show what tenants successfully proved as an extenuating circumstance. A party cannot try to avoid a dismissal with prejudice by requesting a fishing expedition, let alone for the first time on

56

appeal.  A request for jurisdictional discovery must be based on "more than a hunch that it might yield jurisdictionally relevant facts" or more than the plaintiff's stated "belief" that discovery ""will enable them'" to demonstrate jurisdiction. *Boschetto*, 539 F.3d at 1020 (citation omitted); *accord LNS Enterprises LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 864-65 (9th Cir. 2022).  Iten only offers speculation.  That's not enough.

## CONCLUSION

The dismissal of Iten's complaint should be affirmed.  Not only does Iten lack standing to pursue his Contracts Clause claims, those claims fail as a matter of law on the merits.

Dated: November 21, 2022      GLASER WEIL FINK HOWARD AVCHEN & SHAPIRO, LLP
Andrew Baum
Jesse B. Levin
LOS ANGELES COUNTY COUNSEL
Dawyn R. Harrison
Sayuj Panicker
GREINES, MARTIN, STEIN & RICHLAND LLP
 Edward L. Xanders

/s/ *Edward L. Xanders*

Edward L. Xanders

Attorneys for Defendant/Appellee
County of Los Angeles

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

1.    This brief complies with the type-volume limitation of Cir. R. 32-1(a) because this brief contains 13,581 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Times New Roman font.

Dated: November 21, 2022

**GLASER WEIL FINK HOWARD AVCHEN & SHAPIRO, LLP**
Andrew Baum
Jesse B. Levin

**LOS ANGELES COUNTY COUNSEL**
Dawyn R. Harrison
Sayuj Panicker

**GREINES, MARTIN, STEIN & RICHLAND LLP**

/s/ *Edward L. Xanders*
Edward L. Xanders

Attorneys for Defendant/Appellee
County of Los Angeles

58

## STATEMENT OF RELATED CASES

Appellee County of Los Angeles represents that it is not aware of any related cases pending in this Court.

Dated: November 21, 2022

**GLASER WEIL FINK HOWARD AVCHEN & SHAPIRO, LLP**
Andrew Baum
Jesse B. Levin

**LOS ANGELES COUNTY COUNSEL**
Dawyn R. Harrison
Sayuj Panicker


**GREINES, MARTIN, STEIN & RICHLAND LLP**

By:  /s/ *Edward L. Xanders*
_____
Edward L. Xanders

Attorneys for Defendant/Appellee County of Los Angeles

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **APPELLANT'S BRIEF** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 21, 2022.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

  s/ *Gwendolyn West*
Gwendolyn West
